*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* H. CLIFTON, Minor.

UNPUBLISHED
February 9, 2023

No. 361965
Schoolcraft Circuit Court
Family Division
LC No. 2020-003318-NA

Before: PATEL, P.J., and CAMERON and LETICA, JJ.

PER CURIAM.

Respondent appeals as of right the trial court's order terminating his parental rights to the minor child under MCL 712A.19b(3)(c)(*i*) and (c)(*ii*).[1]  We affirm.

## I. STATUTORY GROUNDS

Respondent argues that the trial court erred by finding that clear and convincing evidence supported termination of his parental rights under MCL 712A.19b(3)(c)(*i*) and (c)(*ii*).  We disagree.

## A. STANDARD OF REVIEW

This Court reviews for clear error a trial court's ruling that a statutory ground for termination has been proved by clear and convincing evidence.  *In re Hudson*, 294 Mich App 261, 264; 817 NW2d 115 (2011).  "A finding is clearly erroneous if, although there is evidence to support it, this Court is left with a definite and firm conviction that a mistake has been made."  *Id*. "When applying the clear-error standard in parental termination cases, 'regard is to be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it.' "  *In re Mota*, 334 Mich App 300, 320; 964 NW2d 881 (2020), quoting *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989).

---

[1] The court also terminated the parental rights of the child's mother, but she is not a party to this appeal.

## B. ANALYSIS

"In order to terminate parental rights, the trial court must find by clear and convincing evidence that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been met." *In re VanDalen*, 293 Mich App 120, 139; 809 NW2d 412 (2011). The trial court found that grounds for terminating respondent's parental rights were established under MCL 712A.19b(3)(c)(*i*) and (c)(*ii*), which allow for termination under the following circumstances:

> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order,[2] and the court, by clear and convincing evidence, finds either of the following:

> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

> (*ii*) Other conditions exist that cause the child to come within the court's jurisdiction, the parent has received recommendations to rectify those conditions, the conditions have not been rectified by the parent after the parent has received notice and a hearing and has been given a reasonable opportunity to rectify the conditions, and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

### 1. MCL 712A.19b(3)(c)(*i*)

On March 4, 2020, respondent's five-year-old son was observed with a bloodied nose along with abrasions, scratches, and bruising on his face and head. A doctor attributed those injuries to trauma inflicted within the last 12 to 24 hours. The child and respondent lived alone together in an apartment and the child repeatedly identified respondent as the person who caused his injuries.

---

[2] The court's initial dispositional order was entered on August 18, 2020, and the order terminating respondent's parental rights was entered 620 days later on April 29, 2022.

At the adjudicative hearing,[3] respondent testified that he caught the child as the child was trying to get out the front door on the evening of March 3, 2020.[4] Respondent spanked the child on his buttocks five times, gave the child a time out lasting approximately twenty minutes, and put the child back to bed. At times, respondent's timeouts required the child to stand in the corner and place his hands over his head to stop the child from fidgeting. That night, although respondent had grabbed the child's shoulder, respondent testified that he never touched the child's head or face. The next morning, however, respondent noticed that the child had dried blood on his forehead and cleaned him up. Respondent did not know how the child got the marks, but respondent's "best explanation" was that the child may have fallen while attempting to climb onto his bedroom windowsill and had fallen onto the metal heater below. Respondent denied telling the CPS worker and police that he had harmed the child. Because of respondent's post-traumatic stress disorder,[5] he became argumentative during his interview with the authorities and asked them what they wanted him to say, that he had slapped the child, even though he had not. Respondent also denied telling the CPS worker that he had become so angry that he blacked out. During an earlier hearing, however, respondent testified that he believed that he "may have said there could have been a possibility [that he grabbed the child's face], but [he] doubt[ed] it." Respondent

---

[3] Evidence was presented that respondent had had six prior contacts with Wisconsin's Child Protective Services. In September 2019, respondent took the child to a doctor to address the child's behaviors. Respondent was opposed to the particular medication the doctor prescribed, but after attempting to have the pharmacy follow up with the physician, respondent took no further action. In October 2019, respondent first had contact with Michigan's Children's Protective Services (CPS) and was provided with recommendations, including counseling for himself and the child. Respondent refused counseling. According to the petition, respondent had signed a safety plan at the end of October, agreeing not to use physical forms of punishment and not to leave marks or bruises on the child.

In December 2019, however, respondent refused to work with CPS and refused to sign a safety plan. Respondent was provided with a packet of local service providers and a referral from the Health Department for in-home service providers, but did not contact them. At the adjudicative hearing, a CPS worker testified that he and a state trooper were at respondent's mother's home. According to respondent's testimony, there was a prior incident where he had been falsely accused of threatening to shoot someone. The CPS worker asked respondent if he would shoot him if he was to come for the child. Respondent testified that he remarked that "if anyone came for [his child, he] would probably shoot anyone." Respondent testified that he also knocked the screen out of the storm door because he was angry; however, the CPS worker testified that respondent punched through Plexiglas, lacerating his forearm. Respondent did not display a weapon, but went inside the house, where there was a rifle. The trooper brought respondent outside. When the CPS worker confronted respondent about his alleged statement, the CPS worker testified that respondent said "I would shoot somebody that [came] between [me] and my son." The CPS worker asked, "anyone, even me?" Respondent replied, "anyone." The child was not removed and respondent was not arrested.

[4] The child reported that he had touched the front door knob.

[5] Respondent took prescription medication for this condition.

provided a written statement during his interview, declaring that he did not know how the child was injured.

Investigating personnel confirmed that respondent initially denied knowing how the child's injuries had occurred and then offered that the child could have fallen or self-inflicted his injuries.[6] But respondent subsequently recognized that he might have caused the child's injuries. Respondent stated that he was awakened while on the couch, was "pissed off," and "could have possibly blacked out because he did not remember what had happened."

During their investigation, the police also photographed the child's room. The child slept on an uncovered mattress on the floor with an uncovered pillow and a blanket. Respondent later testified that he had removed the sheets because the child soiled the bed. According to respondent, the child's mattress was on the floor for several reasons, including that the child had jumped on the bed enough to crack its wooden frame, the child had fallen out of the bed, and the child had gotten out of bed and slept on the floor anyway. Respondent further testified that although there may not have been toys in the apartment when the police were there, the child had "a couple Tupperware bins" full of toys and books, which he placed elsewhere in the evening so that the child did not get up and try to play with them all night.

In the foster care home, the child had behavioral issues and required additional supervision. With the exception of a single bloody nose, the child did not self-injure. In fact, the child was "a completely different" child due, in part, to twice-daily prescribed medication.[7] The child was in counseling and saw an occupational therapist as well as a speech therapist weekly. The child was being assessed through the trauma assessment program and a developmental clinic. Finally, the foster mother updated the child on his well-child checks and vaccinations because he was behind on both.

The jury determined that one or more of the statutory grounds alleged in the petition had been proven by a preponderance of the evidence. Those grounds were that respondent, when able

---

[6] Respondent's long-time friend testified that the child was rambunctious, and in the summer of 2019, the child walked over to a truck and banged his head on it, causing bruising. The friend also observed the child scratch his arms and pick his nose until they bled. Additionally, the child ran full speed into a tree, which left a knot on his head. When the child engaged in these behaviors, respondent would yell at him to stop and place him in timeout.

Respondent testified that the child habitually picked his nose until it bled. Moreover, the child's teacher also once called to report that the child ran into a wall repeatedly. Respondent believed that the child's behaviors resulted from either seeking attention or attempting to avoid punishment after the child had gotten into trouble.

The examining doctor opined that while it was possible that the child's injuries were self-inflicted, it was highly unlikely given that he did not observe the child suffering from an acute or underlying psychiatric illness.

[7] Not the prescription medication to which respondent had previously objected. See footnote 3.

to do so, neglected or refused to provide proper or necessary support, education, medical, surgical, or other care necessary for the child's health or morals, that respondent subjected the child to a substantial risk of harm to his mental well-being, or that the child's home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on respondent's part, was an unfit place for the child to live.

When the court entered its initial dispositional order on August 18, 2020, among other things, it ordered respondent: (1) to submit to random drug screens and remain drug and alcohol-free, including marijuana,[8] (2) to maintain a safe and stable home, (3) to allow access to his residence, (4) to participate in a psychological evaluation and follow all recommendations, (5) to maintain legal and verifiable income, and (6) to participate in and benefit from all services, including parenting education. After respondent completed the psychological evaluation at the end of October 2020, the psychologist recommended that respondent complete a fourteen-week parenting class, continue counseling, and comply with the court's orders. Additionally, the psychologist opined that respondent could benefit from anger management. If respondent met those expectations with adequate progress in the next four to six months, reunification should be the goal.

---

[8] At a family-team meeting on June 18, 2020, respondent reported that he had obtained a medical marijuana card. Respondent was 35 years old when the proceedings began and had been smoking marijuana since he was 15. Respondent reported that the marijuana was for his back issues, anxiety, and to increase his appetite. Respondent smoked marijuana daily in the evening. On March 4, 2020, there was a leafy green substance on respondent's bed. In July 2020, respondent's therapist, who had been treating with him since April 2020, determined that respondent did not meet the criteria for "substance use disorder at this time."

Even though the trial court's order to refrain from marijuana use is not directly challenged on appeal, in the future, we caution the trial court regarding the application of the Michigan Medical Marihuana Act (MMMA), MCL 333.26424(d), and the Michigan Regulation and Taxation of Marihuana Act (MRTMA), MCL 333.27955(3), which prohibit a person from being denied custody or visitation with a minor child for acting in accordance with the MMMA and MRTMA unless the person's behavior "creates an unreasonable danger to the minor that can be clearly articulated and substantiated." See *In re Ott*, ___ Mich App ___; ___ NW2d ___ (2022) (Docket No. 362073); *In re Richardson*, 329 Mich App 232, 254; 961 NW2d 499 (2019). See also and compare *People v Thue*, 336 Mich App 35, 37; 969 NW2d 346 (2021) (the court could not prohibit a criminal defendant from MMMA-compliant marijuana use as a term of his probation). In this case, with a few exceptions, respondent continued to use marijuana despite the court's order. Respondent's drug tests typically reflected marijuana was a prescription drug, and the record below shows that the court ended drug testing in light of respondent's continued use in June 2021. As discussed more fully *infra*, respondent's inability to attend to the child's medical and home needs, his inability to manage his diabetes to the point he was rendered unconscious and required hospitalization, and his failure to benefit from services demonstrate that the trial court's statutory-grounds determination was appropriate.

The primary condition that led to adjudication was respondent's physical assault on the child, but other conditions were respondent's failure to address the child's medical issues and the child's home environment. Respondent was provided with numerous services, including a psychological assessment, parenting classes, individual counseling, and joint counseling. At the conclusion of the termination hearing in April 2022, the trial court determined that although respondent had some benefit from the services provided, he had not made enough progress to move forward. This finding is supported by the record evidence.

Throughout the proceedings, respondent denied that he assaulted the child and respondent's therapist proceeded according to his self-report. Their sessions involved anger management, communication, problem-solving, and coping skills. Although respondent and his counselor felt that respondent benefitted, continuing issues show that he did not fully benefit.

The visitation supervisor reported that respondent was easily agitated with the child if his requests were not followed. She described respondent as controlling and irritable and noted that he became quite escalated. When irritated, respondent would become very stern with the child. The child would apologize a few times, tell respondent that he loved him, and then ask when the visit would end. The visitation supervisor also described a visit where respondent was confused about the location and "was very off" due to his diabetes.[9] At a March 2022 visit, respondent appeared extremely tired, was visibly shaking, and his cognitive ability was impaired. Respondent was quite irritable and questioned the caseworker supervising the visit, prompting the child to respond negatively. During an April 2022 visit, respondent was fatigued and had low blood sugar.[10] The new caseworker testified she was not inclined to recommend unsupervised visitation because she did not feel it was safe for the child. The prior caseworker and the visitation supervisor also did not recommend unsupervised visits.

Furthermore, respondent was not engaged in the child's individual counseling. Rather than following up weekly with the child's counselor, respondent followed up intermittently, typically when a court hearing or family team meeting was scheduled. When the child's counselor asked if respondent would continue counseling if the child was returned to him, respondent did not answer. And, even after respondent testified he would continue the child's counseling during the termination hearing, he also opined that his discussions with the child's counselor led him to conclude that little progress had been made.

The counselor, who had limited joint sessions with respondent and the child, opined that they progressed in the issues respondent had identified and that unsupervised visitation would be appropriate. Yet, this counselor recognized that she did not have all pertinent information,

---

[9] In November 2020, the caseworker reported that respondent had brittle diabetes, which caused large fluctuations in his blood-sugar levels and could lead to seizures or unconsciousness. In February 2021, the court ordered respondent to participate in diabetes education through a local hospital and manage his diabetes.

[10] Respondent was hospitalized two days later when his friends called for an ambulance after he lost consciousness.

including information related to respondent's housing and employment, in order to opine whether respondent could meet the child's needs.

Although respondent had an apartment, he was behind on his rent and had received a shut-off notice from his electric company. After viewing the photographs of respondent's apartment, where he lived alone with his therapy dog,[11] the trial court determined that it was not appropriate for the child, and, in fact, was unsanitary due, in part, to dog waste in the bathroom, where respondent kenneled the dog. The court specifically rejected respondent's testimony about the clutter in his apartment because the photographs depicted that the apartment's hallway was effectively cut off, the stovetop was used for storage, and wood with protruding nails was present in the child's bedroom.

Moreover, respondent was sporadically employed. In October 2021, respondent testified that he had a job, but his employer told the caseworker that respondent simply stopped showing up. Respondent's current employment was part-time, with one pay period of 15 hours, and respondent was missing work due to his medical condition.

Respondent also completed a parenting class. Again, however, respondent's actions demonstrated that he did not fully benefit from it. As previously discussed, there were issues with visitation. And respondent testified that "one of the big things" he had learned in parenting class was "to nurture" himself because he could not care for his child "very well" if he could not care for himself. Yet, respondent, who had been diabetic since he was fifteen months old, rejected repeated medical advice about options to manage his diabetes and the dire health consequences of not only that condition, but also regarding his high blood pressure. During these proceedings, the police found respondent unconscious in his car, covered in vomit, and without memory of the surrounding circumstances. And just days before the final termination hearing, respondent's friends summoned an ambulance after respondent lost consciousness due to his diabetes. Similarly, respondent refused to sign a consent form to continue the child's medication, necessitating a court order. These events demonstrate respondent's failure to fully benefit from his parenting classes.

On appeal, respondent contends that he "was largely compliant with the [p]arent [a]gency [t]reatment [p]lan." "[A] parent's failure to comply with the parent-agency agreement is evidence of a parent's failure to provide proper care and custody for the child." *In re JK*, 468 Mich App 202, 214; 661 NW2d 216 (2003). On the other hand, a "parent's *compliance* with the parent-agency agreement is evidence of [his] ability to provide proper care and custody." *Id*. A parent "must both participate in services and 'demonstrate that [he] sufficiently benefited from the services provided.'" *In re Atchley*, ___ Mich App ___, ___; ___ NW2d ___ (2020) (Docket Nos. 358502 and 358503); slip op at 3. And the "parent must demonstrate that [he] can meet [the child's] basic needs before [the child] will be returned to [his] care." *In re Terry*, 240 Mich App 14, 28; 610 NW2d 563 (2000).

In this case, while there was evidence that respondent had made some progress in therapy and shared a bond with the child, the trial court did not clearly err by finding that the evidence

---

[11] Respondent had had the dog for one year, but it was untrained.

supported termination of respondent's parental rights under MCL 712A.19b(3)(c)(*i*). Respondent could not meet his minimum parental responsibilities, never progressed to unsupervised visits, failed to consent to the child's medication, and did not have a suitable home for the child. Considering respondent's general lack of progress and failure to benefit from services for over two years, the trial court also did not clearly err when it found that the conditions that led to adjudication were not reasonably likely to be rectified within a reasonable time considering the child's age.

Because clear and convincing evidence established statutory grounds for termination under MCL 712A.19b(3)(*i*), we need not address the other statutory ground the trial court found satisfied below. *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011) ("Only one statutory ground need be established by clear and convincing evidence to terminate a respondent's parental rights . . . .").

## II.  BEST INTERESTS

Respondent also argues that the trial court erred by finding that termination of his parental rights was in the child's best interests.  We again disagree.

### A.  STANDARD OF REVIEW

This Court reviews for clear error a trial court's finding that termination of parental rights is in a child's best interests.  *In re Payne/Pumphrey/Fortson*, 311 Mich App 49, 63; 874 NW2d 205 (2015).  When applying this standard, "regard is to be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it."  *In re Miller*, 433 Mich at 337; see also MCR 2.613(C).

### B.  ANALYSIS

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made."  MCL 712A.19b(5).  Whether termination of parental rights is in a child's best interests is determined by a preponderance of the evidence.  *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013).  Factors to be consider include "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home."  *In re Olive/Metts*, 297 Mich App 35, 41-42; 823 NW2d 144 (2012) (citations omitted).  A court may also consider whether it is likely that a child could be returned to a parent's home "within the foreseeable future, if at all."  *In re Frey*, 297 Mich App 242, 249; 824 NW2d 569 (2012).  "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption."  *In re White*, 303 Mich App 701, 714; 846 NW2d 61 (2014).

The trial court recognized the strong bond that existed between respondent and the child, but found that the child's need for stability and permanence outweighed this bond.  The court relied

on testimony from the therapist who conducted sessions with both respondent and the child. She testified that the child needed some form of certainty about what was going to happen to him. In response to the court's direct question, the therapist testified that if the child remained in long-term foster care while respondent continued to have visitation, it would impede permanence to the point where it would be contrary to the child's best interests. She clarified that this would be true with most children, and the longer a child was in that situation the more it would be difficult to tolerate such an arrangement. She testified that this could result in increased anxiety, and that this sort of an arrangement was more difficult for older children. The child's individual therapist also testified that while the child had made good progress in therapy, he would feel safer and more stable if he had permanency. A caseworker agreed that the child needed permanency and stability that respondent was unable to provide, primarily because he could not take care of himself. This caseworker was further concerned that respondent would not continue to provide the child with his prescription medication. She also opined that it would be in the child's best interests to terminate respondent's parental rights.

Respondent argues that the trial court clearly erred because the child would not be able to permanently remain with his current foster family because they did not intend to adopt him. A caseworker acknowledged that because the child's foster parents were not willing to adopt him, he would eventually be moved to another home. But this Court has held that termination of parental rights can still be in a child's best interests when the child is in a nonadoptive home and has a bond with the parent. *In re Jones*, 316 Mich App 110, 120-121; 894 NW2d 54 (2016). In that case, this Court determined that the bond between the parent and the children "was outweighed by the children's need for safety, permanency, and stability." *Id*. at 120. This Court noted that the respondent did not obtain suitable housing during the proceedings, and that she could not meet her own financial needs, let alone the needs of the children. *Id*. This Court also discussed the "longstanding and numerous services" that had been provided without success along with the respondent's decision to permit inappropriate individuals in the home. *Id*. This Court concluded that the trial court did not clearly err by finding that termination of the respondent's parental rights was in the children's best interests because "even though the minor children were not in preadoptive placements, any further delay in providing them permanency by allowing respondent additional time to improve her situation was not in the children's best interests." *Id*.

So too here. Respondent and the child shared a strong bond. But respondent cannot safely parent the child because respondent has not adequately managed his anger and medical issues or cared for his home and his therapy dog. The trial court did not clearly err by finding that the

situation was unlikely to change in the foreseeable future. Further delaying the child's permanence is not in the child's best interest and the trial court did not clearly err in finding that termination of respondent's parental rights was in the child's best interest.[12]

Affirmed.

/s/ Sima G. Patel
/s/ Thomas C. Cameron
/s/ Anica Letica

---

[12] Respondent also complains that the trial court failed to consider permanency options other than adoption at the permanency planning hearing, as contemplated by MCR 3.976(A). This issue was not included in respondent's statement of questions presented, and, therefore, we decline to consider it. *In re Rippy*, 330 Mich App 350, 362 n 5; 948 NW2d 131 (2019); MCR 7.212(C)(5). Regardless, at this hearing, the trial court opted to continue with the goal of reunification, noting that petitioner would be filing a termination petition.